**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 1:22cv-203

| | |
|---|---|
| **COMMODITY FUTURES TRADING COMMISSION,**<br><br>Plaintiff,<br><br>v.<br><br>**THE W TRADE GROUP LLC, LARRY RAMOS MENDOZA AND JOSEPH CARVAJALES,**<br><br>Defendants. | **COMPLAINT FOR INJUNCTIVE RELIEF, RESTITUTION, CIVIL MONETARY PENALTIES AND OTHER EQUITABLE RELIEF UNDER THE COMMODITY EXCHANGE ACT** |

Plaintiff Commodity Futures Trading Commission ("Commission") alleges as follows:

## I.  SUMMARY

1.  From at least June 2013 through June 2020 (the "Relevant Period"), The W Trade Group LLC ("WTG"), by and through the actions of its employees and agents, including but not limited to, Larry Ramos Mendoza ("Ramos"), and Joseph Carvajales ("Carvajales"), (collectively "Defendants"), fraudulently solicited customers by phone, the internet, and U.S. mail, to open individual trading accounts in order to trade in, among other things, commodity futures ('futures"), retail foreign currency on a leveraged or margined basis ("forex") and/or options on commodity futures contracts ("options").  In their customer solicitations, Defendants made numerous false and misleading material statements concerning, among other things, whether WTG actually traded on behalf of WTG's customers, the profitability of WTG's trading, and WTG's ability to minimize risk.

2. In connection with this, WTG and Ramos misappropriated more than $19 million from at least 220 customers to pay for personal and business expenses and diverted funds deposited by new customers to make Ponzi scheme-like payments to earlier customers who requested account withdrawals. Moreover, WTG, by and through the actions of Ramos, fabricated account statements in an effort to prevent WTG customers from learning that they had misappropriated customer funds.

3. By virtue of this conduct, and as more fully set forth below, WTG and Ramos have engaged, are engaging, and/or are about to engage in acts and practices in violation of Sections 4b(a)(1)(A)-(C), 4b(a)(2)(A)-(C), and 4c(b) of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 6b(a)(1)(A)-(C), 6b(a)(2)(A)-(C), and 6c(b), and Commission Regulation ("Regulation") 5.2(b)(1)-(3) and 33.10(a)-(c), 17 C.F.R. §§ 5.2(b)(1)-(3) and 33.10(a)-(c) (2021).

4. By virtue of this conduct, and as more fully set forth below, Carvajales has engaged, is engaging, and/or is about to engage in acts and practices in violation of 7 U.S.C. §§ 6b(a)(1)(A) and (C), 6b(a)(2)(A) and (C), and 6c(b), and 17 C.F.R. §§ 5.2(b)(1) and (3) and 33.10(a) and (c).

5. At all relevant times, the acts of Ramos and Carvajales were committed within the scope of their employment, agency, or office with WTG. Therefore, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2021), WTG is liable as a principal for the actions of Ramos and Carvajales in violation of the Act and Regulations.

6. At all times during the Relevant Period, Ramos was the controlling person of WTG. Therefore, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Ramos is liable as the

controlling person for the actions of WTG and Carvajales in violation of the Act and Regulations.

7. Unless restrained and enjoined by this Court, Defendants are likely to continue to engage in the acts and practices alleged in this Complaint or in similar acts and practices, as described more fully below.

8. Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, the Commission brings this action to enjoin Defendants' unlawful acts and practices and to compel compliance with the Act and Regulations, and to further enjoin Defendants from engaging in any commodity-related activity.

9. In addition, the Commission seeks civil monetary penalties, restitution, and remedial ancillary relief, including but not limited to, trading and registration bans, disgorgement, rescission, pre- and post-judgment interest, and such other relief as the Court may deem necessary and appropriate.

## II.     JURISDICTION AND VENUE

10. This Court possesses jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1345 (U.S. district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress). In addition, Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a), provides that U.S. district courts have jurisdiction to hear actions brought by the Commission for injunctive relief or to enforce compliance with the Act in the proper district court of the United States whenever it shall appear to the Commission that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

11. With respect to Defendants' purported forex transactions, the Commission also has jurisdiction over the conduct and transactions at issue pursuant to Section 2(c)(2)(C) of the Act, 7 U.S.C. § 2(c)(2)(C). For example, Section 2(c)(2)(C)(i) of the Act, 7 U.S.C. § 2(c)(2)(C)(i) sets out the agreements, contracts or transaction subject to the Commission's forex jurisdiction. Moreover, Section 2(c)(2)(C)(vii) of the Act, 7 U.S.C. § 2(c)(2)(C)(vii), underscores the Commission' forex jurisdiction by reaffirming that, "the Commission shall have jurisdiction over, an account or pooled investment vehicle that is offered for the purpose of trading, or that trades, any agreement, contract, or transaction in foreign currency described in" Section 2(c)(2)(C)(i) of the Act. Additionally, forex agreements, contracts, and transactions, and accounts (as set out in Section 2(c)(2)(C)(i)) and forex accounts or pooled investment vehicles (as set out in Section 2(c)(2)(C)(vii)) shall be subject to, among other things, Section 4b of the Act, 7 U.S.C § 6b, pursuant to § 2(c)(2)(C)(ii)(I) of the Act, 7 U.S.C. 2(c)(2)(C)(ii)(I).

12. Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), because Defendants are found in, inhabit, or transact business in this District and the acts and practices alleged in this Complaint have occurred or are occurring within this District.

### III.   THE PARTIES

13. Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency charged by Congress with the administration and enforcement of the Act and Regulations promulgated thereunder. The Commission maintains its principal office at 1155 21st Street N.W., Washington, DC 20581.

14. **The W Trade Group LLC** is a Delaware company formed in June 2013, authorized to transact business in Florida. The formation documents list Ramos as WTG's sole officer, director, and agent. Its principal place of business is located at 5201 Blue Lagoon Drive,

Miami, FL, 33126.  WTG has never been registered with the Commission.

15. **Larry Ramos Mendoza** is an individual residing in Miami, Florida.  During the Relevant Period, he was the Managing Director and sole officer of WTG.  He has never been registered with the Commission.

16. **Joseph Carvajales** is an individual residing in Miami, Florida.  He was WTG's Investor Relations Director and assisted in operating WTG until his resignation in November 2019.  He was previously registered with the Securities and Exchange Commission.  He has never been registered with the Commission.

## IV.  FACTS

### A.  *Defendants Committed Sales Solicitation Fraud*

17. During the Relevant Period, WTG, Ramos, and Carvajales fraudulently solicited members of the general public throughout the United States and abroad to engage in, among other things, futures, forex, and/or options trading.  In their fraudulent solicitations, Ramos and Carvajales, acting as employees and agents of WTG, made numerous false statements to WTG customers and prospective customers.

18. First, in an effort to give prospective WTG customers a false sense of security, Carvajales, acting as an agent of WTG, falsely represented that WTG operates on the "four main exchanges" in New York, Sydney, Tokyo and London.  In fact, WTG, operated on none.  Additionally, Carvajales, also falsely asserted that WTG's trading in the US was "supported by SIPC" and trading in the UK was "supported by FSCS," when in fact there was no regulatory oversight of WTG's non-existent trades.

19. Second, Ramos and Carvajales, acting as employees and agents of WTG, misrepresented to prospective WTG customers that WTG would trade futures, forex, and/or

5

options on behalf of customers. After discussions with Ramos and Carvajales about the "futures contracts" WTG was trading, prospective customers were given an application to open individualized trading accounts at an online futures commission merchant which included a list of commodities their funds purportedly would trade. In fact, WTG never traded on behalf of customers, in individualized or pooled accounts. Ramos and Carvajales failed to disclose to WTG customers that individual trading accounts had not been opened, or that customer funds had not been placed into trading accounts at all.

20.     Third, Ramos and Carvajales, acting as employees and agents of WTG, claimed to prospective WTG customers that WTG traded customer funds using a commodity trading algorithm Ramos had developed, and each trade made using the algorithm would generate up to a 4% return. Ramos claimed to one potential customer that he had software that "looked at the last 80 years of commodities behavior" and it would put out an alert to tell you where to put the money. Carvajales, after describing the algorithm that Ramos had purportedly developed, told at least one potential customer that there was a minimum of 1.7% profit a month. This was untrue. No trading was ever done by WTG for its customers, much less with a commodity trading algorithm.

21.     Fourth, Ramos, and Carvajales, acting as employees and agents of WTG, further claimed falsely that WTG customers would only risk 2% of their funds per transaction, and if WTG lost 15 consecutive transactions for a maximum total loss of 30%, it would immediately cease all transactions. Ramos told prospective customers that "his expertise was to protect investments" and that if he saw the risk going too high, WTG would pull out of the trade. Carvajales represented to a prospective customer that if a loss ever got to more than 2%, they

would pull the trade from the market. This was also untrue because WTG did not open any customer accounts, nor did it trade customer funds.

22. Finally, in an effort to demonstrate WTG's trading sophistication, Ramos, and Carvajales, acting as employees and agents of WTG, also claimed falsely that prospective customers would have access to their trading accounts through a WTG mobile application, where they could review their account statements, and could withdraw their funds at any time. At least one prospective customer described how Carvajales set up the WTG mobile application on his phone. However, the WTG mobile application accounts that customers were able to access, showed fraudulent account statements that represented false trading profits.

23. In soliciting customers, Ramos and Carvajales on behalf of WTG, made no attempt to determine if customers were eligible contract participants ("ECPs") under Section 1a(18)(A)(xi) of the Act, 7 U.S.C. § 1a(18)(A)(xi). In fact, most, if not all, of WTG's customers were not ECPs.

      **B.**    ***WTG and Ramos Engaged in Misappropriation***

24. Based upon Ramos' and Carvajales' fraudulent solicitations, WTG received approximately $19 million from at least 220 customers for the purported purpose of trading futures, forex, and/or options. Rather than use customer funds for trading, WTG and Ramos misappropriated these funds, which had been deposited in WTG bank accounts opened by Ramos. WTG and Ramos used customer money for Ramos' and Carvajales' personal expenses and salaries, and WTG business expenses.

25. WTG and Ramos also diverted customer funds to make Ponzi scheme-like payments to customers who requested withdrawals from WTG.

26.     WTG and Ramos also appear to have used customer money to maintain and operate a boat named "The Blessing."  Ramos and Carvajales used the boat to entertain and solicit customers and to give the impression that they were operating a successful business.  In one instance Ramos deposited $109,000 of checks consisting of customer money to a WTG bank account in October of 2018 and then transferred $9,000 of it to a separate WTG controlled bank account twelve days later.  The following day Ramos paid for a boat charter totaling $3,769.80 from the second WTG account.  Altogether Ramos, using WTG accounts, spent $50,000 on boating expenses, including marina fees, maintenance and repairs, and charters.

27.     WTG customers attempted unsuccessfully to withdraw money from their supposedly profitable accounts.  For example, one customer asked for his funds to be returned, and Ramos provided him with a check, but asked him to wait 2 weeks prior to depositing the funds.  After 2 weeks, the customer attempted to deposit the check, but was told by his bank that there were insufficient funds in WTG's account.  When the customer confronted Ramos and threatened to go to the police, Ramos told the him that he would have better luck getting his funds back without Ramos in prison.  The fraudulent scheme ended in June 2020, at which time WTG and Ramos had misappropriated all of their customers' money.

C.     *WTG and Ramos Sent False Records to Customers*

28.     Throughout the Relevant Period, WTG and Ramos sent WTG customers falsified account statements through the WTG mobile application.  Rather than showing that WTG had not actually opened trading accounts on behalf of customers with their funds, the WTG mobile application showed false balances and profits for each customer.

29.     WTG and Ramos, sent fake 1099-INT tax forms to at least one WTG customer. That fake tax form purported to show a trading profit of $79,513, when in fact there had been no trading of customer funds through WTG.

### D.     *Interstate Commerce and Control*

30.     As part of their scheme, Defendants used the U.S. mail or other instrumentalities of interstate commerce, including telephone and internet, to: (1) receive funds from customers; (2) disseminate marketing documents to actual and potential customers; and (3) disseminate false statements to actual and potential customers.

31.     At all times during the Relevant Period, Ramos was WTG's Managing Director and sole officer. Ramos possessed both general control over WTG's business and specific control over the conduct underlying WTG's and Carvajales's violations. Ramos was the ultimate decision maker, and controlled all aspects of WTG's business. Ramos, in conjunction with other employees, managed the WTG day-to-day operations, and engaged in the solicitation of new and existing customers. Ramos opened and had signatory authority on all WTG bank accounts in WTG's name.

## V.     VIOLATIONS OF THE COMMODITY EXCHANGE ACT

## COUNT I

**FRAUDULENT CONDUCT IN VIOLATION OF
SECTION 4b(a)(1)(A)-(C) OF THE ACT, 7 U.S.C. § 6b(a)(1)(A)-(C)
(FUTURES TRANSACTIONS)**

31.     The allegations set forth in paragraphs 1 through 30 are re-alleged and incorporated herein by reference.

32.     Section 4b(a)(1)(A)-(C) of the Act, 7 U.S.C. § 6b(a)(1)(A)-(C), makes it unlawful:

> [F]or any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce or future delivery that is made, or to be made, on or subject to the rules of a designated contract market, for or on behalf of any other person . . .
>
> (A) to cheat or defraud or attempt to cheat or defraud the other person;
>
> (B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record;
>
> (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract . . . .

33. During the Relevant Period, in connection with the purported trading of futures conducted or to be conducted by Defendants on behalf of WTG customers, WTG and Ramos violated 7 U.S.C. § 6b(a)(1)(A)-(C) by, among other things: (i) misappropriating customer funds; (ii) making, causing to be made; and distributing reports or statements to customers that contained false information; and (iii) making material misrepresentations to WTG's customers and prospective customers.

34. During the Relevant Period, in connection with the purported trading of futures conducted or to be conducted by Defendants on behalf of WTG customers, Carvajales violated 7 U.S.C. § 6b(a)(1)(A) and (C) by making material misrepresentations to WTG's customers and prospective customers.

35. Defendants engaged in the acts and practices described above willfully, knowingly or with reckless disregard for the truth.

36. Each act of misappropriation, misrepresentation and issuance of a false statement, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6b(a)(1)(A)-(C).

37. Ramos directly or indirectly controlled WTG and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting WTG's violations of 7 U.S.C. § 6b(a)(1). Therefore, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Ramos is liable for each of WTG's violations of 7 U.S.C. § 6b(a)(1)(A)-(C) as a controlling person of WTG.

38. The acts of Ramos and Carvajales, as described in this Complaint, were done within the scope of their employment and/or agency with WTG. Therefore, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C § 2(a)(1)(B) and Regulation 1.2, 17 C.F.R. § 1.2 (2021), WTG is liable as a principal for each act or failure of Ramos and Carvajales that constitute violations of 7 U.S.C. § 6b(a)(1)(A)-(C).

## COUNT II

### FRAUDULENT CONDUCT IN VIOLATION OF SECTION 4b(a)(2)(A)-(C) OF THE ACT, 7 U.S.C. § 6b(a)(2)(A)-(C) and COMMISSION REGULATION 5.2(b)(1)-(3), 17 C.F.R. § 5.2(b)(1)-(3) (2021) (FOREX TRANSACTIONS)

39. The allegations set forth in paragraphs 1 through 38 are re-alleged and incorporated herein by reference.

40. Section 4b(a)(2)(A)-(C) of the Act, 7 U.S.C. § 6b(a)(2)(A)-(C) makes it unlawful:

> [F]or any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or swap, that is made, or to be made, for or on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market—
>
> (A)   to cheat or defraud or attempt to cheat or defraud the other person
>
> (B)   willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record;

 (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person . . . .;

41. 7 U.S.C. § 6b(a)(2)(A)-(C) applies to forex transactions as if they were futures contracts pursuant to Section 2(c)(2)(C)(iv) of the Act, 7 U.S.C. § 2(c)(2)(C)(iv).

42. Regulation 5.2(b)(1)-(3), 17 C.F.R. § 5.2(b)(1)-(3) makes it unlawful:

[F]or any person, by use of the mails or by any means or instrumentality of interstate commerce, directly or indirectly, in or in connection with any retail foreign exchange transaction:

(1) To cheat or defraud or attempt to cheat or defraud any person;

(2) Willfully to make or cause to be made to any person any false report or statement or cause to be entered for any person any false record; or

(3) Willfully to deceive or attempt to deceive any person by any means whatsoever.

43. During the Relevant Period, WTG and Ramos violated Section 7 U.S.C. § 6b(a)(2)(A)-(C) and 17 C.F.R. § 5.2(b)(1)-(3) by, among other things: (i) misappropriating customer funds; (ii) making, causing to be made; and distributing reports or statements to customers that contained false information; and (iii) making material misrepresentations to WTG's customers and prospective customers. in connection with purported forex trading.

44. During the Relevant Period, Carvajales violated Section 7 U.S.C. § 6b(a)(2)(A) and (C), and 17 C.F.R. § 5.2(b)(1) and (3) by making material misrepresentations to WTG's customers and prospective customers in connection with purported forex trading.

45. Defendants engaged in the acts and practices described above willfully, knowingly or with reckless disregard for the truth.

12

46. Each act of misappropriation, misrepresentation, and issuance of a false statement, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6b(a)(2)(A)-(C) and 17 C.F.R. § 5.2(b)(1)-(3).

47. Ramos directly or indirectly controlled WTG and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting WTG's violations of 7 U.S.C. § 6b(a)(2)(A)-(C) and 17 C.F.R. § 5.2(b)(1)-(3). Therefore, pursuant to 7 U.S.C. § 13c(b), Ramos is liable for each of WTG's violations of 7 U.S.C. § 6b(a)(2)(A)-(C) and 17 C.F.R. § 5.2(b)(1)-(3) as a controlling person of WTG.

48. The acts of Ramos and Carvajales, as described in this Complaint, were done within the scope of their employment and/or agency with WTG. Therefore, pursuant to 7 U.S.C § 2(a)(1)(B) and 17 C.F.R. § 1.2 (2021), WTG is liable as a principal for each act or failure of Ramos and Carvajales that constitute violations of 7 U.S.C. § 6b(a)(2)(A)-(C) and 17 C.F.R. § 5.2(b)(1)-(3).

## COUNT III

### VIOLATIONS OF SECTION 4c(b) OF THE ACT, 7 U.S.C. § 6c(b) AND COMMISSION REGULATION 33.10(a)-(c), 17 C.F.R. § 33.10(a)-(c) (2021) (OPTIONS TRANSACTIONS)

49. The allegations set forth in paragraphs 1 through 48 are re-alleged and incorporated herein by reference.

50. Section 4c(b) of the Act, 7 U.S.C. § 6c(b) provides "No person shall offer to enter into, enter into or confirm the execution of any transaction involving any commodity regulated under this Act which is of the character of, or is commonly known in the trade as, an "option", . . . "bid", "offer", . . . "put" [or] "call" . . . contrary to any rule [or] regulation, of the Commission . . . prohibiting any such transaction or allowing any such transaction under such

terms and conditions as the Commission shall prescribe."

51. Regulation 33.10(a)-(c), 17 C.F.R. § 33.10(a)-(c) provides that:

> It shall be unlawful for any person directly or indirectly—(a) To cheat or defraud or attempt to cheat or defraud any other person; (b) To make or cause to be made to any other person any false report or statement thereof or cause to be entered for any person any false record thereof; or (c) To deceive or attempt to deceive any other person by any means whatsoever in or in connection with an offer to enter into, the entry into, the confirmation of the execution of, or the maintenance of, any commodity option transaction

52. During the Relevant Period, WTG and Ramos violated 7 U.S.C. § 6c(b) and 17 C.F.R. § 33.10(a)-(c) by, among other things: (i) misappropriating customer funds; (ii) making, causing to be made; and distributing reports or statements to customers that contained false information; and (iii) making material misrepresentations to WTG's customers and prospective customers in connection with purported options transactions.

53. During the Relevant Period, Carvajales violated Section 7 U.S.C. § 4c(b) and 17 C.F.R. § 33.10(a) and (c) by making material misrepresentations to WTG's customers and prospective customers in connection with purported options transactions.

54. Defendants engaged in the acts and practices described above willfully, knowingly or with reckless disregard for the truth.

55. Each act of misappropriation, misrepresentation, and issuance of a false statement, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6c(b) and 17 C.F.R § 33.10(a)-(c).

56. Ramos directly or indirectly controlled WTG and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting WTG's violations of 7 U.S.C. § 6c(b) and 17 C.F.R. § 33.10(a)-(c). Therefore, pursuant to 7 U.S.C. § 13c(b), Ramos is liable

for each of WTG's violations of 7 U.S.C. § 6c(b) and 17 C.F.R. § 33.10(a)-(c) as a controlling person of WTG.

57.     The acts of Ramos and Carvajales, as described in this Complaint, were done within the scope of their employment and/or agency with WTG.  Therefore, pursuant to 7 U.S.C § 2(a)(1)(B), 17 C.F.R. § 1.2 (2021), WTG is liable as a principal for each act or failure of Ramos and Carvajales constitute violations of 7 U.S.C. § 6c(b) and 17 C.F.R. § 33.10(a)-(c).

## VI.     RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests that the Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1, and pursuant to its own equitable powers, enter:

A.      An order finding that WTG and Ramos violated Sections 4b(a)(1)(A)-(C), 4b(a)(2)(A)-(C), and 4c(b) of the Act, 7 U.S.C. §§ 6b(a)(1)(A)-(C), 6b(a)(2)(A)-(C), and 6c(b), and Regulations 5.2(b)(1)-(3) and 33.10(a)-(c), 17 C.F.R. §§ 5.2(b)(1)-(3) and 33.10(a)-(c) (2021);

B.      An order finding that Carvajales violated Sections 4b(a)(1)(A) and (C), 4b(a)(2)(A) and (C), and 4c(b) of the Act, 7 U.S.C. §§ 6b(a)(1)(A) and (C), 6b(a)(2)(A) and (C), and 6c(b), and Regulations 5.2(b)(1) and (3) and 33.10(a) and (c), 17 C.F.R. §§ 5.2(b)(1) and (3) and 33.10(a) and (c) (2021);

C.      An order of permanent injunction enjoining WTG and Ramos, and their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, who receive actual notice of such order by personal service or otherwise, from engaging in the conduct described above, in violation of have engaged, are engaging, and/or are about to engage in acts and practices in violation of 7 U.S.C. §§ 6b(a)(1)(A)-(C), 6b(a)(2)(A)-(C), and

6c(b), and Regulations 5.2(b)(1)-(3) and 33.10(a)-(c), 17 C.F.R. §§ 5.2(b)(1)-(3) and 33.10(a)-(c) (2021);

    D.    An order of permanent injunction enjoining Defendant Carvajales and his affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with him, who receive actual notice of such order by personal service or otherwise, from engaging in the conduct described above, in violation of have engaged, are engaging, and/or are about to engage in acts and practices in violation of 7 U.S.C. §§ 6b(a)(1)(A) and (C), 6b(a)(2)(A) and (C), and 6c(b), and 17 C.F.R. §§ 5.2(b)(1) and (3) and 33.10(a) and (c) (2021);

    E.    Enter an order of permanent injunction restraining and enjoining Defendants, and their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, from directly or indirectly:

    (i)    Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40));

    (ii)    Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2021)), for accounts held by Defendants or in which Defendants have a direct or indirect interest;

    (iii)    Having any commodity interests traded on Defendants' behalf;

    (iv)    Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

    (v)    Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

    (vi)  Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2021);

    (vii)  Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2021)), agent, or any other officer or employee of any person (as that term is defined in Section 1a(38) of the Act, 7 U.S.C. § 1a(38)) registered, exempted from registration, or required to be registered with the Commission, except as provided for in Regulation 4.14(a)(9)); and/or

    (viii)  Engaging in any business activities related to commodity interests;

  F.  Enter an order directing Defendants, as well as any third-party transferee and/or successors, to disgorge, pursuant to such procedure as the Court may order, all benefits received including, but not limited to, salaries, commissions, loans, fees, revenues, and trading profits derived, directly or indirectly, from the acts or practices which constitute violations of the Act and Regulations as described herein, including pre- and post-judgment interest;

  G.  Enter an order directing Defendants, as well as any of their successors, to make full restitution to every person or entity who has sustained losses proximately caused by the violations described herein, including pre-judgment and post-judgment interest;

  H.  Enter an order directing Defendants, as well as any of their successors, holding companies, and alter egos, to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between, with, or among

Defendants and any person or entity whose funds were received by Defendants as a result of the acts and practices that constitute violations of the Act or Regulations as described herein;

  I. Enter an order directing Defendants to pay a civil monetary penalty, to be assessed by the Court, in an amount not to exceed the penalty prescribed by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114-74, 129 Stat. 584, tit. VII, § 701, and Regulation 143.8, 17 C.F.R. § 143.8 (2021), for each violation of the Act or Regulations, as described herein, plus post-judgment interest;

  J. Enter an order requiring Defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412; and

  K. Enter an order providing such other and further relief as the Court may deem necessary and appropriate under the circumstances.

Dated: February 7 , 2022  Respectfully submitted,

  **COMMODITY FUTURES TRADING COMMISSION**

  */s/Eugenia Vroustouris*
  Eugenia Vroustouris
  Alison B. Wilson
  Commodity Futures Trading Commission
  Division of Enforcement
  1155 21st Street, NW
  Washington, DC 20581
  Telephone: (202) 418-5000
  Facsimile: (202) 418-5337
  evroustouris@cftc.gov
  awilson@cftc.gov

  *Attorneys for Plaintiff*